William David Bush
240 West St, Sebastopol
California, 95472
(305)707-7991

**FILED**

APR 08 2021

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

# UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA

| WILLIAM D. BUSH | Case No.: 20-cv-04059-SK |
|---|---|
| Plaintiff | |
| vs. | |
| Defendants | |
| Croft Enterprises LLC  Paul Thomas Croft | BREACH OF CONTRACT COMPLAINT FOR: |
| .... | COMPENSATION |

## JURISDICTION

This Court has original jurisdiction over this action under 28 U.S.C. § 1332. The Plaintiff is a citizen of the United States of America, residing in Sonoma County of the State of California, and the Defendants are all residents of different States, with the value of the controversy exceeding $75,000 (see below for clarification of the calculated value for damages and injury attributable here caused from the actions of the Defendants.) The Defendants in the circumstance alleged in this complaint operated remotely from various locations, truly unknown to the Plaintiff. They have made statements for the record to this court of their residence locations, but he Plaintiff cannot be sure where the defendants actually reside; the U.S. Marshalls service was unable to serve, either of the Defendants at their listed addresses of business domicile. The Plaintiff believes this diversity of the

parties, and the value of calculated damages gives this court Diversity Jurisdiction over the the matter in that all of the Defendants remotely telecommuted into California availing them to this Courts Domain of Authority. The Plaintiff requests the court to take jurisdiction of this case, but in the event the Court determines otherwise, the plaintiff preemptively requests this Court to stipulate the case matter to the proper venue and Forum of Jurisdiction as it sees fit and proper.

## PARTIES

Plaintiff, William David Bush is a person, who for all considerations here in resides in Sonoma County, California.

Defendant, Croft Enterprises LLC is a corporation with this principle place of business listed as Minneapolis, Minnesota.

Defendant, Jonathan Frost, is the President of JD Frost CPA's, a Croft Enterprises company.

Defendant, Paul Croft, is the Chief executive Officer of Croft Enterprises LLC, with an unknown location of residence.

Defendants Does (1-25) Full names to be amended upon discovery.

## ALLEGATIONS

The Plaintiff alleges that on and about April 15th 2020, a legal agreement was made between the Plaintiff and the Defendant(s), and was subsequently breached by the Defendants by an intentional fraudulent artifice causing damage and injury to the Plaintiff.

## STATEMENTS OF THE MATTER

The Plaintiff was initially contacted by an associate of Croft enterprises in or around April 5th of 2020, through an acquaintance he had met in Las Vegas

1  some year previous at a business convention. We had a 'how have you been
2  catch up conversation' by phone. I had mentioned that I was dealing with an
3  Automated Teller Machine (ATM) business hostile takeover situation in
4  Mexico City with a portfolio of placement machines I had been developing
5  for many years, detailing how things were coming to a boiling point in
6  resolving the disputed shares of the company and its associated portfolios; I
7  also mentioned that I was looking into helping my brother buy a Country
8  Club in Auburn, California, because his boss, the owner, was getting ready
9  to retire-- this being a pre-Covid situation. The conversation continued into
10 what he was working on, last I remembered, he was a Basketball Coach, and
11 they had just won the National Championships in Las Vegas. He then began
12 to explain to me the financial services business partners he was working
13 with, and that if my brother needed loans for real estate acquisition with a
14 business purchase, that his business partners had credit lines into Bank of
15 America for such. At the time I was entertaining the idea because it seemed
16 genuine, and I had no reason to not try and get my brother into a better
17 financial position to secure the loans he was going to need if he wanted to
18 acquire the Auburn Country Club. We agreed to talk again later, and I
19 mentioned he should connect with my business associate Tyler Colt, adding
20 Merchant Financial Services to his bag of business tools which could be
21 provided to his network of clientele in Chicago (in the month of May 2020
22 those two connected for the purpose of discussing the tax preparation
23 opportunity and the merchant services platform.) We scheduled a follow up
24 call a few days later. I spoke with my brother, David Luke Bush, regarding
25 the interesting connection for capital credit with Bank of America. The
26 associate of Croft Enterprises called me again 3 days later, and we began to
27 discuss what would be required to secure a loan for a general figure estimate
28

1  of 15 Million US Dollars. He said he would get back to me with the list of
2  prerequisites, and so forth; At which point he mentioned that they would
3  definitely need my brothers Tax returns and associated documentation, and
4  that he was working with a company "Croft Enterprises" that are experts in
5  business capital and tax strategy and preparation. He went on to explain he
6  had saved and gotten back many of his friends and family tens of thousands
7  of dollars, and some of his professional connections much more. He
8  outlined that the Croft team was extremely sharp in going back and finding
9  tax positions that other people may have missed, and they had a proprietary
10 strategy which was making Millions of dollars for the company and its
11 Clients. I was intrigued, having some, but little knowledge into the tax law
12 codes; although knowing that companies like Amazon have been profiting 5
13 Billion US dollars in net revenue without paying any taxes I was interested
14 to learn more. He said he might be able to get me a meeting with the
15 President of the organization Paul Croft. I said ok, set it up. He called me
16 the next week saying that Paul had some time available later that week to get
17 on the phone and talk about the business. We scheduled the time, and got on
18 a conference call later that week. Initially everything seems legit, it wasn't
19 until Paul made some quote about "Al Capone" that I had a double take
20 moment. But the conversation continued, his explanation of things was
21 confident, he explained they used an S-corporation model, which allowed
22 them to better stance the clients position and avoid many instances where
23 taxes would usually be applicable. I spent some time explaining my
24 background in the ATM and merchant services industry; Paul mentioned
25 they were interested in bringing on new marketing partners in California;
26 and that normally their agents get 15%, but because of my background, Paul
27 could afford me at 25%. Based on the numbers and calculations they were
28

explaining, and the number of businesses and professionals I know, and have access to on an ownership level, it made a lot of profitable sense.. Croft enterprises required an upfront deposit of $1500 and then grossed $3500 plus 10% of the adjusted returns on the back end after the IRS refunded the refiled amended tax returns. After Paul estimated the tax returns on my brothers accounts to be roughly $25,000. I could see how the revenue stream could pump up quickly if this was made upfront cost free for my clients-- in that I could put up the $1500 deposit, and recalculating the return adjustments make significant revenue potential.. Thinking that as long as my network of Clients didn't need to put up money, they would be very open and I could convince them into having a licensed professional accounting agency refile their taxes in a more aggressive manor. So the conversation continued, and we agreed to send over more documents, and follow up in a couple weeks to confirm. During which time I went through my rolodex and started identifying potential candidates, and making initial phone calls planting seeds about the new wiz tax strategy that this high powered accounting group could achieve without any upfront cost with a back end split; I further collected all of the information for the previous 3 years banking statements and receipts for my brother in assistance to him, and process diligence for myself. On April 15th Pauls associate sent me set up another conference call; On this call we agreed to the 25% spit of commissions for clients that I brought into the business fold for Croft, and the concept of me fronting the initial deposits, to then gain a larger back end percentage split with my clients. We agreed on those business terms, and proceeded to discuss further details. My focus was on mitigating risk for myself and my clients. Be it that Croft enterprises operates with a firm of licensed accountants, sells insurance, and various other business related

1  utilities, I expected all bases to be coverable, and requested that we develop
2  an insurance bond, which would secure clients from any financial loss
3  exposure stemming from any potential accounting mistakes. Paul sent me
4  over a contract for what was termed "Audit Insurance." This was the point
5  at which I began to realize this business enterprise might be a scam. In
6  reading the "audit Insurance" document that Paul sent to me- it made no
7  sense, it was a hollow indemnifying agreement, which effectuated the
8  opposite of coverage to the client, and instead denied any warranty of the
9  services being provided, and limited Croft Enterprises liability strictly to the
10 amount the signatory had paid Croft Enterprises, and that any losses or
11 damages incurred would be the sole responsibility of the Client. After
12 reading this document, I began to ask more questions regarding the methods
13 to be employed in the tax position being marketed; I spoke with 3 different
14 Croft associates, whom can be identified at a later date; two of whom gave
15 me sales pitches on the viability and provided some tax law precedent
16 examinations, and other highlights. Follow up further through I dug into the
17 law examination briefs they provided, and it had nothing to do pertaining to
18 my specified and critical question of: 'How can a tax payer go backwards in
19 time and amend their tax returns using an S-Corporation to write off
20 personal or otherwise expenses as business write offs.' Specifically
21 requesting the Title 26 USC code section which allowed such, or something
22 official from the IRS updating the tax models to concur with their retroactive
23 tax adjustments. This was the point at which I believed this was a
24 Fraudulent artifice, and that Paul Croft and his associates had been planning
25 to defraud me, my brother, my network of clients, the IRS, and the State of
26 California in a fraudulent tax scam of back dating tax returns. At this point
27 in time, not being a tax expert by any means, I googled tax attornies near
28

me, and called 'A Tax Attorney' in Santa Rosa, California, by the name of Mr. Greenberg. I explained the situation to him, he said he had never heard of anything like that being allowable under the IRS rules.  To Double check, I called Gregory Coleman, of New Jersey, New York, a former FBI agent whom I had previously sought expert advisement from on an ATM industry case, he immediately told me that what I described was Tax "Fraud." Thirdly, I contacted a former IRS agent, whom also confirmed this to be known by Paul Croft, Jonathan Frost, and their licensed accountants as illegitimate.

My initial reaction was to consider my options, as I had already received confidential and sensitive paperwork documentation from clients for the purpose of conducting this business venture with Croft Enterprises; I proceeded to contact Paul Croft directly by Linked in messanger, requesting a call time, and that I had discovered a urgent critical issue I would like to discuss with him. He responded asking for more information, and I generally told him I had discovered that "back dating" was not legitimate under the Title Codes. He sharply responded telling me I had "some nerve" to be talking to him like that, and he would be instruction his team to no longer communicate with me moving forward, and that if my brother wanted to work with them he could, but that I was ex-communicated. At which point he blocked me from Linked-in, and stopped responding to my emails. I then told my brother what I had discovered-- he was very upset, and disappointed; I told him I was sorry for wasting his time and that I would do what I could to get his information security breach resolved; something of which is still out there. The other clients I had spoken with were less upset, but I could tell they were also disappointed, and their confidence in my business prowess had been injured.

1
2
3  The Plaintiff Alleges the following for Breach of Oral Contract:
4      The Defendant(s) individually committed acts of fraud numerous times
5  while tricking the Plaintiff into collaboration with their illicit scheme and
6  *ipso facto* (how they) breached the legal business agreement made between
7  the Plaintiff and Paul Croft, the president of Croft Enterprises; The terms of
8  the agreement were that Bush, the Plaintiff, would solicit and bring clients to
9  Croft Enterprises for the purposes of Tax Advisement and Preparation, and
10 the Plaintiff would receive 25% of the total commissions charged to the
11 clients acquired in such fashion; The provision of the agreement breached is
12 fundamental, in that the agreement was represented as a legitimate service to
13 be provided to the Plaintiffs clientele, which in fact turned out to be a a
14 fraudulent tax scam; The plaintiff performed under this agreement by
15 securing documentation and bringing Clients to the table, the plaintiff is
16 excusable further under the doctrine of fraudulent artifice & inducement;
17 The Plaintiff was damaged in the loss of his time and injury to his
18 reputation- both of which are the basis of his livelihood as a business owner
19 and consultant; The agreement between the parties was made orally with
20 supporting email documentation with Paul Croft, and developed through his
21 associates and employees over a period of a few months.
22
23 The Plaintiff alleges the following as a Fraudulent artifice:
24     Paul Croft, and his associated employees within Croft enterprises
25 represented, many times over the entire period of this misgiven business
26 venture beginning in or around April 1st, 2020 - May 30th, 2020, that by
27 utilizing an S-corporation, the Plaintiff, and his clients would be able to
28

amend and refile 3 years back of tax returns to reflect previously quantified personal or other non deductible expenses as business expenses, and therefore reduce the plaintiffs clientele tax exposure very significantly, generating larger returns and revenue share for the Plaintiff; these representations were made orally, and by email correspondence. The Defendants knew these representations to be false and that they intended to fraudulently induce the Plaintiff, and there from his clienteles reliance on said misrepresentations.  The defendants collaboratively lied and attempted to trick me into swindling my network of clientele and family into their ill-gotten tax scam against the IRS and the State of California.

WHEREFORE, Plaintiff demands relief against Defendants for an award of compensatory damages of $2,100,000 by breach of agreement and injury stemming therefrom; the damages incurred are from the time and business resources spent in proceeding into business with the defendants for a period of about a 45 days, calculating a general business time and resource value of $400,000 USD calculated as such for the number of hours attributable thus far, predicating upon the work value associated with the due diligence entailed and performance by the Plaintiff after entering into a business relationship with the Paul Croft and his associated group of companies up to this point; Furthermore the injuries incurred are to the Plaintiffs personal and business reputation, in that after spending a month laying the ground work for bringing in new clients, establishing appointments for conference calls, and availing the Plaintiffs network of clientele to the business opportunity tendered between the parties to this case, with a fair and reasonable injury value of losses in potential revenue of $1,700,000; The Plaintiff further requests the Court to award punitive damages according to the substance and

merits to be proven at trial; and for all costs associated to this lawsuit; and for any other and further relief as the Court deems just and proper.

The Plaintiff hereby demands a trial by Jury.

Dated: April 5, 2021

                      Respectfully resubmitted,

By: _____

                   William David Bush

                        Plaintiff